UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

JAMES  WALKER, II,                              )
                                                )
                        Plaintiff,              )
                                                )
            vs.                                 )
                                                )        No. 1:12-cv-01392-SEB-TAB
ALLISON TRANSMISSION, INC.,                     )
                                                )
                        Defendant.              )

## ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

This cause is before the Court on Defendant Allison Transmission, Inc.'s Motion for

Summary Judgment [Docket No. 31], filed on August 30, 2013 pursuant to Federal Rule of Civil

Procedure 56. For the reasons set forth below, the motion is GRANTED.

## Factual and Procedural Background

Plaintiff James Walker, an African American male, began working as a temporary

employee for the Allison Transmission division of General Motors at its Indianapolis plant in

2006. Def.'s Br. 2. In 2008 he became a full-time employee of Defendant Allison Transmission,

Inc., which had become an independent company the previous year. *Id.* Throughout his tenure

with Allison Transmission, Walker was a member of the bargaining unit represented by United

Auto Workers Local 933. Harbin Aff. at ¶ 5. He worked in several departments before

transferring to Department 6A03 in August 2009; he remained stationed there until his

termination. *Id.* at ¶ 7.

Walker worked the afternoon shift in Department 6A03 along with several coworkers

who were involved in the events giving rise to this suit. Andrea McElroy, an African American

1

woman, began working in the department in early 2010, Appx. D at 8–9; Tammi Holland, also an African American woman, began work there in May 2010. Appx. E at 6–7. Stacie Zachary, a Caucasian woman, was the department's "group leader" and among the longest-tenured employees in the department, having worked there since 2006. Harbin Aff. at ¶ 10. The company's labor relations representative for the department was Jeff Pence, a Caucasian male. Appx. F at ¶¶ 1–3.

## A. The Sexual Harassment Allegations against Walker

In August 2010, McElroy, Holland, and Zachary complained to Allison management that they had been sexually harassed by Walker. McElroy alleged that Walker harassed her on several occasions both verbally and physically, including the following conduct: approaching her from behind and unsnapping her bra after being told that the contact was unwanted, grabbing her breasts during a work shift break, pulling her onto his lap at work despite her protests, asking her to perform oral sex on him, attempting to force his head between her legs, and offering her a motorcycle jacket in exchange for her doing "what he wanted." Appx. N, Ex. 14 at 3–5. She recounted that these incidents came to a head on July 26, 2010, when she and Walker had a verbal confrontation in her work area, in which Walker became irate, called her a "lying bitch," and had to be restrained by his coworkers. *Id.* at 1.

Stacie Zachary also submitted a complaint to management about Walker's behavior. In a written statement, she described Walker's generally disruptive behavior and poor performance as contributing to a perpetual atmosphere of "drama" in the department for which she was team leader. More specifically, she related that Walker had called her a "fat bitch" to other co-workers and had discussed his intention "to buy her a ho-ho [snack cake] so she'll sit the fuck down." Appx. N, Ex. 75 at 2. She later found a ho-ho, together with a derogatory note, on her desk, and

she concluded that Walker had put it there. *Id.* at 2. Zachary also corroborated elements of McElroy's sexual harassment allegations, confirming that she had seen Walker touch McElroy in an unwelcome fashion and that she had witnessed the July 26 altercation between Walker and McElroy. *Id.* at 5.

Tammi Holland provided a report of Walker's misconduct largely consistent with the other complaints. On July 26, 2010—the same day as Walker's work altercation with McElroy—Holland said she had confronted Walker about his calling her a "little Oompa Loompa." Appx. N., Ex. 20 at 1. According to Holland, Walker implicitly confirmed that he had used the epithet, and he further described Zachary as a "big Oompa Loompa."[1] *Id.* Holland further stated that she had seen Walker purchase the ho-ho and leave it with a note on Zachary's desk, and she confirmed that Walker had called Zachary a "bitch." *Id.* at 4. According to labor relations representative Jeff Pence, Holland confirmed in an investigatory conversation with Pence that she had witnessed Walker grab McElroy's breasts at work despite McElroy's warnings that the contact was unwelcome. *Id.* at 5.

Walker denied most of these accusations at the time when confronted by management, and he continues to deny them now. According to him, he had had consensual sexual relationships first with Zachary and then with McElroy, and he contends that many of the sexual harassment allegations were either mischaracterizations of consensual behavior or outright fabrications. With regard to McElroy's allegations of inappropriate sexual touching at work, he denies that such contact with McElroy was anything but consensual, and he asserts that none of it took place at work. Walker Aff. ¶ 14; *see generally* Pl.'s Resp. 3–5. He admits that he had a

---

[1] As Defendant (perhaps unnecessarily) clarifies, Oompa Loompas are the small, rotund characters who serve as Willy Wonka's minions, enforcers, and balladeers in the Roald Dahl children's book *Charlie and the Chocolate Factory* and subsequent film adaptations. Walker's alleged use of the term was presumably intended to imply that the two women were overweight.

confrontation with McElroy on July 26, 2010, but he contends that it was initiated by McElroy, who was upset when, shortly after Walker ended his relationship with her, she discovered that he had previously had a sexual relationship with Zachary as well. Pl.'s Resp. 6.[2] He notes that a number of the alleged instances of misconduct had no witnesses other than McElroy, and he alleges that McElroy, Zachary, and Holland engaged in a coordinated effort to force him out of the department by making sexual harassment accusations. To corroborate this theory, Walker points to Holland's deposition testimony, in which she states that McElroy and Zachary got her "hyped up" to submit a complaint against Walker. Pl.'s Resp. 9 (citing Holland Dep. 33–34). Co-worker Monica Nelson, whose deposition was taken in this case but who did not participate in Allison's initial investigation, stated that the end of the sexual relationship between Walker and McElroy precipitated the July 26 confrontation, and that McElroy fabricated the allegations of harassment to punish Walker and in order to save her own job. Nelson Dep. 29. According to Nelson, she heard McElroy express to another co-worker her intention to "get that nigger out of here." *Id.* at 30.

**B. Allison's Investigation and Walker's Termination**

Jeff Pence, Allison's labor relations representative with responsibility for Department 6A03, received and reviewed the written statements submitted by McElroy, Zachary, and Holland in August 2010. Pence Aff. 1–2.  He also spoke to Walker's friend and co-worker LaMarcus Jones after he received the complaints. Pence Dep. 40. Pence then scheduled Walker for a Disciplinary Interview (DI), a procedure mandated by United Auto Workers' collective bargaining agreement with the company before an employee may be disciplined. Harbin Aff. ¶

---

[2] To support this characterization, Walker relies on the statements of Holland, who testified in her deposition that McElroy was "pointing and yelling" at Walker, and called him a "bitch motherfucker." Holland Dep. 18. He also notes that, in an affidavit, his friend and co-worker LaMarcus Jones recounts that "James Walker never got in McElroy's face" and that McElroy was the instigator of the July 26 confrontation. Pl.'s Resp. 6; Jones Aff. ¶¶ 5–8.

11. Walker learned that he was scheduled for a DI on August 9, 2010. Apparently on the advice of his union representative Kevin Cox, Walker went on medical leave to forestall the DI and any attendant discipline. At some point after learning that he was the subject of sexual harassment complaints, he and Cox in collaboration wrote and circulated what Walker called a "petition," denying that he engaged in misconduct. In part, the petition stated: "It is known by some of the persons that have signed this Statement that the claims of sexual harassment are false and fabricated, in retaliation for the relationships held [sic] between James and [McElroy and Zachary]. Those who have signed this statement agree and have knowledge of the false nature of the claims." Appx. N, Ex. 17. Below the typewritten statement on the petition appear five signatures—all apparently belonging to co-workers of Walker's. *Id.*

Walker finally returned to work at Allison on October 25, 2010, and his DI took place the same afternoon. Walker Dep. 114. Besides Walker himself, four men were present at the hearing: UAW representatives Kevin Cox and Phil Doyle, and Allison labor relations representatives Jeff Pence and Maurice McDaniel. Appx. N, Ex. 21. According to Pence and McDaniel, Walker appeared apathetic during the hearing, playing with his cell phone and giving nonchalant answers to questions about his conduct. Pence Aff. at ¶ 7; McDaniel Aff. at ¶ 5. Upon questioning at the hearing, the transcript shows that Walker conceded the truth of some of the accusations: he admitted calling McElroy a "lying bitch," referring to Zachary as an "Oompa Loompa," and referring to Zachary and McElroy as "jealous bitches." Appx. N, Ex. 21 at ¶¶ 1–3. He also admitted offering McElroy presents in exchange for sexual favors, but he insisted that any such conversation took place at his motorcycle shop and not at work—and before he terminated his consensual relationship with McElroy. *Id.* at ¶ 6. Prompted by union representative Kevin Cobb, Walker explained his theory that the accusations were "revenge" for his breaking off

relationships with McElroy and Zachary. *Id.* at 3. At the close of the hearing, Cobb stated: "Looks like [a] sexual affair between 3 people that went bad. And now some are trying to get revenge." *Id.*

Prior to the DI, Pence had discussed the accusations against Walker with McDaniel, Allison Manager of Labor Relations Tony Harbin, and Director of Labor Relations Mary Coari, who had final disciplinary authority. Although the Allison officials had reviewed the written statements made by the three women, it is not clear whether they were aware of the "petition" circulated by Walker and signed by some of his co-workers. Pence Dep. 45. After discussion, Coari determined that Walker should be terminated, subject to the outcome of the DI. Coari Dep. 18–20. After his official interview with Walker, Pence determined to go forward with the termination; he informed Walker later that same afternoon that he was being terminated for violation of Allison's sexual harassment and workplace violence policy. Pence Aff. ¶ 9.

Pursuant to the process established by the collective bargaining agreement between Allison and UAW, Walker filed a grievance protesting his firing immediately after he received his notice of termination. Appx. N, Ex. 80 (Walker Termination Grievance). After the grievance progressed through three steps of the procedure until Allison issued a final denial, UAW filed a "notice of appeal" on Walker's behalf on March 11, 2011. This appeal remained pending until August 9, 2012, when the Union withdrew it as part of a "global settlement" with Allison. Coari Dep. 22–23. While his internal grievance was pending, Walker also filed a discrimination complaint with the Indiana Civil Rights Commission (ICRC) claiming that he had been terminated because he was African American. The ICRC dismissed the complaint, and the United States Equal Employment Opportunity Commission subsequently affirmed the dismissal

on September 12, 2011. Appx L. Plaintiff filed suit in this Court on September 28, 2012. Docket No. 1.

## Legal Analysis

### Standard of Review

Summary judgment is appropriate on a claim if the moving party can show that there is no genuine dispute as to any material fact, leaving them entitled to judgment as a matter of law. Fed. R. Civ. Pro. 56(a); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–323 (1986). The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Disputes concerning material facts are genuine where the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In deciding whether genuine issues of material fact exist, the court construes all facts in a light most favorable to the non-moving party and draws all reasonable inferences in favor of the non-moving party. *See id.* at 255. However, neither the Amere existence of some alleged factual dispute between the parties,@ *id.*, 477 U.S. at 247, nor the existence of Asome metaphysical doubt as to the material facts,@ *Matsushita*, 475 U.S. at 586, will defeat a motion for summary judgment. *Michas v. Health Cost Controls of Ill., Inc.*, 209 F.3d 687, 692 (7th Cir. 2000).

Summary judgment is not a substitute for a trial on the merits, nor is it a vehicle for resolving factual disputes. *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). Therefore, after drawing all reasonable inferences from the facts in Plaintiff's favor, if genuine doubts remain and a reasonable fact-finder could find for Plaintiff, summary judgment is inappropriate. *See Shields Enters., Inc. v. First Chicago Corp.*, 975 F.2d 1290, 1294 (7th Cir.

1992). But if it is clear that Plaintiff will be unable to satisfy the legal requirements necessary to establish his case, summary judgment is not only appropriate, but mandated. *Ziliak v. AstraZeneca LP*, 324 F.3d 518, 520 (7th Cir. 2003). Further, a failure to prove one essential element Anecessarily renders all other facts immaterial.@ *Celotex*, 477 U.S. at 323.

## Discussion

Plaintiff claims that he suffered discriminatory employment treatment on account of his race in violation of 42 U.S.C. § 1981. Section 1981 is a codification of a portion of the Civil Rights Act of 1866 safeguarding the right of all Americans to "make and enforce contracts" without regard to race. 42 U.S.C. § 1981(a). Although there are several noteworthy distinctions between this provision and Title VII of the 1964 Civil Rights Act, it is well established that methods of proving a violation under the two statutes are interchangeable.[3] *See Morgan v. SVT, LLC*, 724 F.3d 990, 995 (7th Cir. 2013); *McGowan v. Deere & Co.,* 581 F.3d 575, 579 (7th Cir. 2009).

In order to withstand summary judgment on a Section 1981 or Title VII claim, "the plaintiff one way or the other must present evidence showing that . . . a rational jury could conclude that the employer took that adverse action on account of h[is] protected class, not for any non-invidious reason." *Hester v. Ind. State Dep't of Health*, 726 F.3d 942, 946 (7th Cir. 2013). Federal courts have described two pathways by which a claimant may meet this burden: the direct method and the indirect method. A plaintiff can prevail under the direct method "by constructing a convincing mosaic of circumstantial evidence that allows a jury to infer intentional discrimination by the decisionmaker." *Petts v. Rockledge Furniture LLC*, 534 F.3d

---

[3] Title VII is a more restrictive cause of action than Section 1981 in several ways, including its inclusion of a cap on damages, its requirement of exhaustion of administrative remedies, and its application only to defendants with 15 or more employees.

715, 726 (7th Cir. 2008) (quoting *Rhodes v. Ill. Dep't of Transp.,* 359 F.3d 498, 504 (7th Cir. 2004)) (further citations omitted).

In an attempt to address the difficulties that often face plaintiffs in building a convincing circumstantial case for discrimination at the summary judgment stage, the United States Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), endorsed a more formulaic burden-shifting approach that has come to be known as the "indirect method" of proof. 411 U.S. at 802. The two methods are not intended as rigid, mutually-exclusive procedural straitjackets; indeed, the Seventh Circuit has recently emphasized the need for "flexibility and common sense" in this area. *Morgan,* 724 F.3d at 996–997. Here, Plaintiff has relied exclusively on the indirect *McDonnell Douglas* method. We therefore follow his lead in focusing on that burden-shifting framework. *See id.* at 995 ("When a plaintiff is responding to an employer's motion for summary judgment, he must initially identify whether he is litigating his case under a 'direct' or 'indirect' method of proof (or both).").

Under the *McDonnell Douglas* framework, a plaintiff first bears the burden of setting forth a *prima facie* case for discrimination, which he may satisfy by showing that: "(1) he is a member of a protected class, (2) he met his employer's legitimate job expectations, (3) he suffered an adverse employment action, and (4) similarly situated employees outside of the protected class received more favorable treatment." *Morgan,* 724 F.3d at 996 (quoting *Keeton v. Morningstar, Inc.*, 667 F.3d 877, 884 (7th Cir. 2012)). If the plaintiff crosses this threshold, then the burden shifts to the employer to articulate a "legitimate, nondiscriminatory reason" for the adverse employment action. *McDonnell Douglas,* 411 U.S. at 802. If the employer does so, the burden shifts back to the plaintiff to present evidence that, if believed by the trier of fact, would show that the real explanation for the action is discrimination. *Morgan,* 724 F.3d at 996. Both

parties here concede that Walker, as an African American, is a member of a "protected class"; it is also beyond dispute that his termination by Allison was an "adverse employment action." Def.'s Br. 21. The viability of Plaintiff's *prima facie* case thus hinges on his ability to demonstrate that he was meeting Allison's legitimate employment expectations and that similarly situated non-African American employees received different treatment.

## I.      Legitimate employer expectations

Defendant contends that Walker failed to live up to Allison's legitimate expectations for its employees in two respects: not only did he engage in sexual harassment of co-workers, but he also used profane, work-inappropriate language both before and during his disciplinary interview. Def.'s Br. 22. Specifically, Defendant notes that Walker acknowledged calling female co-workers "bitches" and "Oompa Loompas"; Defendant also maintains that, during his hearing, Walker "used the gratuitous phrase 'I fucked those bitches' to refer to his alleged sexual relationships with Zachary and McElroy." Def.'s Br. 22. Plaintiff denies ever making such a statement during the disciplinary interview.

The Seventh Circuit has made clear that a claimant bears the burden of showing that he was meeting the employer's legitimate expectations at the time that the employer took adverse action against him. *Peele v. Country Mut. Ins. Co.*, 288 F.3d 319, 329–330 (7th Cir. 2002). Further, satisfactory job performance must be "established and not merely incanted." *Grayson v. O'Neill*, 308 F.3d 808, 818 (7th Cir. 2002). The "general statements of co-workers," such as the "petition" that Plaintiff circulated for signature, are generally not sufficient on their own to meet this evidentiary burden. *See Peele,* 288 F.3d at 329; *see also Dey v. Colt Constr. & Dev. Co.*, 28 F.3d 1446, 1460 (7th Cir. 1994) ("Our cases . . . give little weight to statements by supervisors or

co-workers that generally corroborate a plaintiff's own perception of satisfactory job performance.").

However, where a plaintiff claims that an employer applied its employment expectations in a discriminatory manner by treating other employees who violated such expectations in a more favorable manner, prongs two and four of the *McDonnell Douglas* analysis merge. *See Ekhatib v. Dunkin Donuts, Inc.*, 493 F.3d 827, 831 (7th Cir. 2007); *Grayson,* 308 F.3d at 818. "[W]here the issue is whether the plaintiff was singled out for discipline based on a prohibited factor, it 'makes little sense . . . to discuss whether she was meeting her employer's reasonable expectations.'" *Curry v. Menard, Inc.*, 270 F.3d 473, 478 (7th Cir. 2001) (quoting *Flores v. Preferred Technical Grp.,* 182 F.3d 512, 515 (7th Cir. 1999)). Here, Plaintiff claims that Allison applied its workplace policies on sexual harassment in a discriminatory manner. *See* Pl.'s Resp. 25. He can therefore make his *prima facie* Section 1981 case if he can show that the company applied its policies in a manner that granted more favorable treatment to similarly situated non-African American employees.[4]

## II.     Similarly situated employees

Another employee is similarly situated to a plaintiff if there are "sufficient commonalities on the key variables between the plaintiff and the would-be comparator to allow the type of comparison that, taken together with the other prima facie evidence, would allow a jury to reach an inference of discrimination." *Humphries v. CBOCS West, Inc.,* 474 F.3d 387, 405 (7th Cir. 2007), *aff'd,* 553 U.S. 442 (2008). Similarly situated employees "must be directly comparable to

---

[4] Although Defendant appears to argue in its memorandum in support of summary judgment that Plaintiff's inappropriate behavior during the DI could have furnished an independent basis for terminating him, the record makes clear that he was ostensibly terminated for violating sexual harassment and "workplace violence" policies. Pence Dep. 47–48; Appx. N, Ex. 79. Bound as we are at this stage to construe the facts in a manner most favorable to Plaintiff—thus accepting his insistence that he never exclaimed "I fucked those bitches" during the DI—we see no facts that would have supported a nondiscriminatory firing unrelated to the accusations of sexual harassment, especially since Defendant never identified what company policy Walker's attitude or use of such language violated.

the plaintiff in all material respects," but they need not be identical in every conceivable way. *Coleman v. Donahoe*, 667 F.3d 835, 846 (7th Cir. 2012) (citing *Patterson v. Ind. Newspapers, Inc.,* 589 F.3d 357, 365–66 (7th Cir. 2009)). Three criteria figure prominently in the Seventh Circuit's inquiry into whether a given set of employees are similarly situated. "In the usual case a plaintiff must at least show that the comparators (1) dealt with the same supervisor, (2) were subject to the same standards, and (3) engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Coleman,* 667 F.3d at 847 (citing *Gates v. Caterpillar, Inc.,* 513 F.3d 680, 690 (7th Cir. 2008)); *see also Snipes v. Ill. Dep't of Corr.*, 291 F.3d 460, 463 (7th Cir. 2002).

Plaintiff identifies two white Allison employees, Bryan Berry and Elijah Taylor, who he alleges received more favorable treatment despite being similarly situated.[5] We examine the factual circumstances of these two proposed comparators.

## A. Bryan Berry

Brian Berry is a white Allison employee who worked in the same assembly department as female co-worker Chantel Holder for approximately two years.[6] Holder Dep. 9. For roughly a year, Berry sought to engage with Holder in what Holder perceived as inappropriate sexual conversations; these advances and innuendos made Holder feel uncomfortable, and she told Berry so. *See* Pl.'s Resp. 15–16. When the comments persisted, Holder reported them on October

---

[5] The designated evidence contains discussion of a third potential comparator, Rock Swartz. Swartz was accused of sexual harassment by co-worker Donna Portis, who claimed that he had exposed his underwear to her and done "sexy moves." Pence Dep. 9–11. Jeff Pence investigated the incident, but none of the three people that Portis had identified as witnesses corroborated her story, and the company ultimately did not impose a sanction on Swartz. Pence Dep. 9–11; Appx. N, Exs. 61, 62. Presumably because of these weaknesses in the case against Swartz, Plaintiff has not mentioned Swartz as a comparator in his brief opposing summary judgment.
[6] There seems to be confusion between the parties regarding the spelling of Mr. Berry's first name. Most of the documents in the record spell it "Brian" rather than "Bryan."

20, 2011 to supervisor Trent Perry.[7] Holder Dep. 55–56. Perry forwarded the complaint to Pence, who gave Berry a written copy of Allison's sexual harassment policy and warned him that further inappropriate comments would not be tolerated. Pence Dep. 21–22. Berry continued to make inappropriate remarks, and his behavior finally escalated into physical touching when he intentionally bumped into Holder in a hallway. Holder Dep. 40–41. The incident was witnessed by at least one other employee, who agreed with Holder's view that the touching was intentional and inappropriate, and was accompanied by an "aggressive" comment. Anderson Aff. ¶ 6. After first conferring with UAW about having Berry transferred to another plant, Holder made a written complaint on January 19, 2012. *Id.* at 46; *see also* Pl.'s Ex. P.

In response, Pence initiated an investigation and scheduled Berry for a DI. Pence Dep. 22, 26. After the hearing, Allison terminated Berry on January 23, 2012 for violation of its sexual harassment policy. *See* Appx. N, Exs. 70, 72. As with the termination of Walker, Pence presided over the DI and headed the investigation preceding the hearing, Pence Dep. 16, while Mary Coari exercised final decision-making authority with respect to the termination. Coari Dep. 18.

Unlike Walker, however, Berry was eventually reinstated. Pence denied his internal grievance and appeals, but UAW secured his re-hiring in August 2012 as part of a global settlement the union reached with Allison. Coari Dep. 14–16. The settlement involved the resolution of some 20 to 30 pending employment grievances, and Coari has testified that she would not have considered the reinstatement "if the union wasn't pushing for it as part of th[e] bargaining of the global settlement." *Id.* at 38. At the same time, however, Coari noted that she was willing to consider Berry's reinstatement as proposed by the union because "Brian Berry's physical contact was not sexual in nature," and because "[h]e did not exhibit any performance

_____

[7] According to Holder, some co-workers had reported the misconduct to plant manager Leonard Fernandes before she complained to Perry in October 21. Holder Dep. 15–16. Holder says she spoke to Fernandes, but she lacks personal knowledge of whether any action was taken at that point. *Id.* at 17.

issues that I can recall or attendance issues that I can recall, which are other things we consider." *Id.* at 16.

Defendant contends, and we agree, that Berry is not a valid comparator because his treatment by the company took place in two phases: first his termination, and then the separate decision to reinstate him.

Regardless of whether their misconduct was of comparable seriousness, Allison dealt with Berry and Walker in similar fashion; once Pence received a written complaint, both were scheduled for disciplinary interviews, after which both were fired almost immediately. *See* Pence Dep. 28. Even if it is later reversed or modified, a termination qualifies as an "adverse employment action." *Cf. Goodwin v. Bd. of Trustees of the Univ. of Ill.*, 442 F.3d 611, 619 (7th Cir. 2006) (noting that a demotion, even if later rescinded, "clearly meets the third prong" of the *McDonnell Douglas* test); *see also Ezell v. Potter,* 400 F.3d 1041, 1049 (7th Cir. 2003). Like Walker's, Berry's initial appeals of the termination decision were denied.

By the time Coari acceded to Berry's reinstatement, however, the circumstances of his case diverged significantly enough from those surrounding Walker's failed bid at reinstatement that the two men were no longer "similarly situated." According to Mary Coari's uncontroverted testimony, the only reason that Berry's reinstatement was on the table as part of the "global settlement" with UAW in 2012 was that the union was specifically pushing for Berry to be rehired. Coari recalled that UAW negotiators Dan Gibson and Jim Zent "felt Brian deserved reinstatement and were recommending reinstatement." Coari Dep. 16. When asked if she would consider reinstatement without prompting from the union, Coari stated: "I wouldn't bring back any discharged employee if it wasn't for the request of the union." *Id.* at 38. As Walker himself recognized, the union made no such effort to secure reinstatement on his behalf. According to his

testimony, UAW representative Dan Gibson informed him in 2012 that the union had decided to "drop" his employment grievance with Allison. He describes his reaction as follows: "I wasn't happy. I asked him why. He said they weren't going to win it. And I asked him how did he figure that. And he was like 'James, I'm just telling you we dropped your case.'" Walker Dep. 172. In his deposition, Walker also spelled out the contrast to the union's treatment of Berry: "[T]he union fought to get his job back, and he was one of the people that got his job back due to the contract negotiation." *Id.* at 177.

This court dealt with similar facts in *Crouch v. Whirlpool Corp.*, 2005 WL 1528200 (S.D. Ind. June 20, 2005), *aff'd* 447 F.3d 984 (7th Cir. 2006). There, an employee terminated for falsifying leave forms brought an FMLA claim; in opposing summary judgment, he relied on the *McDonnell Douglas* burden-shifting approach and sought to show that a similarly situated co-worker—who had been terminated and then re-instated after the union pursued her grievance—received more lenient treatment. The court rejected the plaintiff's argument, stating as follows:

> Assuming, arguendo, that Crouch and Chase were similarly situated prior to their respective violations of Shop Rule # 1, the court finds that Chase was not treated more favorably than Crouch. Whirlpool consistently treated violation of Shop Rule # 1 as grounds for termination and both Chase and Crouch were terminated on those grounds. The fact that Chase was offered reinstatement stems from the fact that Local 808 [the union] chose to pursue her grievance. Local 808 chose not to pursue Crouch's grievance. Local 808's decision not to pursue the matter cannot be interpreted as discrimination on the part of Whirlpool.

*Crouch,* 2005 WL 1528200, at *6. Here, Plaintiff may have grounds to feel that UAW treated him unfairly by pushing for Berry's reinstatement and failing to pursue his. From Allison's perspective, though, the two cases were no longer comparable; Berry's reinstatement was a pill to be swallowed in order to achieve a broader compromise with the union, whereas Walker's was never even on the table. Allison treated the two employees almost identically by firing them for their respective alleged violations of the sexual harassment policy, and with respect to

reinstatement there can be no inference drawn from the company's failure to treat unlike circumstances alike. For this reason, Brian Berry is not a valid comparator in satisfaction of Plaintiff's *prima facie* burden.

**B. Elijah Taylor**

Elijah Taylor was also a white Allison employee. McDaniel Dep. 8. In August 2010, his female co-worker Chantel Baxter complained to Allison management about Taylor's behavior. She alleged specifically that on August 20, 2010, he walked up to her while she was engaged in conversation with colleague Tyron Johnson and told her "I thought I was going to have to muzzle you by putting my dick in your mouth." McDaniel Dep. 17; Pl.'s Ex. R-40. Both Baxter and Johnson reported that, as he said this, he grabbed his genitals in a provocative fashion. McDaniel Dep. 14–15, 17; Pl.'s Ex. R-39. On another occasion, Baxter reported that Taylor, having recently returned from vacation time, told Baxter he had pictures to show her on his phone. Assuming they were pictures of Taylor's recently-born child, Baxter looked at Taylor's cell phone, only to find that it was displaying a photo of Taylor's penis. Pl.'s Ex. R-41.

Both Baxter and Johnson submitted written statements describing Taylor's misconduct. *See* Pl.'s Ex. R-39, R-40, R-41. Maurice McDaniel, an Allison labor relations representative, reviewed these accusations, assuming the same role that Pence exercised in the Walker and Berry investigations. McDaniel Dep. 19. After conducting a disciplinary interview, the company suspended Taylor for 30 days and the balance of that day's shift for violating Allison's policy against sexual harassment. McDaniel Dep. 21. As with Walker and Berry, Mary Coari had primary decision-making authority in imposing the suspension on Taylor. Coari Dep. 18.

Plaintiff asserts, and Defendant does not dispute, that Taylor and Walker were subject to the same standards—namely, the Allison sexual harassment policy—and were both disciplined

by the same supervisor. Pl.'s Resp. 29–30. They disagree in their characterizations of how Walker's alleged misconduct measures up against Taylor's. Defendant insists that Taylor's violation of the sexual harassment policy differed from Walker's both in its magnitude and in the number of co-workers it affected: unlike Walker, Taylor never engaged in sexual touching, and he targeted only one colleague rather than three. Def.'s Br. 13–14. Plaintiff retorts that the qualitative distinction between the two employees' misbehavior is unsupported by the evidence. "Taylor's conduct is as serious as Walker's because the most serious allegations against Walker either did not happen or if they did happen, McElroy consented to the conduct and was not offended by it." Pl.'s Resp. 29. We must therefore resolve two questions regarding Taylor's viability as a comparator: first, whether Allison was factually warranted in drawing a distinction between the types of conduct engaged in by Walker and Taylor; second, whether the two were "similarly situated" notwithstanding whatever factual distinctions exist.

## 1. The evidence of Walker's misconduct

Although we construe the facts in a light most favorable to Plaintiff in weighing this motion for summary judgment, we have no obligation to accept Plaintiff's characterizations of those facts at face value. In his brief opposing summary judgment, Plaintiff states as follows:

> McElroy makes it clear in the first sentence of her statement that if Walker groped, grabbed or put his face between her legs as she claims, she was not offended by it. McElroy states she did not feel her work environment was hostile prior to the incident that happened on July 26, 2010.
>
> In addition to McElroy's admission, other evidence that Defendant was aware or had in its possession proves that the "touching" that McElroy alleges either did not happen or she consented to it and was not offended by it. She never reported any of this conduct to anyone prior to July 26, 2010. McElroy states there were no witnesses to any of the touching she alleges and noone [sic] told her they witnessed any of it. Zachary claims she witnessed Walker groping and slapping McElroy's butt, but she does not claim to have witnessed the specific allegations made by McElroy. Further, Zachary reported no allegations under after she talked to McElroy after July 26, 2010. Five co-workers of McElroy and Zachary

submitted a petition which stated that McElroy had a sexual affair with Walker that ended badly. The petition further states that the co-workers who signed it witnessed no harassment. Walker submitted his cell phone records which show that McElroy called him often during the time she claims he was harassing her. Walker stated in his disciplinary interview that he had a consensual affair with McElroy and all sexual activity was consensual and took place at his motorcycle shop . . . . **Defendant had all of this evidence prior to Walker's termination.**

Pl.'s Resp. 29–30 (emphasis added). Plaintiff's statements mischaracterize the factual record in several respects. We address these errors in turn.

> ### a. *"McElroy makes it clear in the first sentence of her statement that if Walker groped, grabbed or put his face between her legs as she claims, she was not offended by it."*

McElroy's written statement to Allison Management never expressed overtly or implied that she was "not offended" by Walker's efforts to initiate sexual touching at work—either in its first sentence or elsewhere. Her first sentence stated only that "6A03 has become a hostile work environment because of what happen [sic] on July 26, 2010." Appx. N, Ex. 14 at 1. In fact, she recounted elsewhere in the statement that the July 26 incident was "not the first time James Walker disrespected me," and she went on to describe past incidents. *Id.* at 2. "James Walker is always groping me on the job. There have been many cases of him slapping me on my behind . . . . One day I was working in the mod center [when] he came behind me and unsnap[ped] my bra through my shirt and he started laughing. I was really upset . . . . He want[ed] to do it but I wouldn't let him. I told James I do not play like that." *Id.* It is clear from McElroy's statement that she viewed the altercation with Walker on July 26, 2010, as the culminating episode of a longer series of incidents; no reasonable fact-finder could read McElroy's statement as implying that the July 26 altercation was the first time that McElroy had had a problem with Walker, or that the previously recounted instances of sexual touching were consensual.

### b. *"She never reported any of this conduct to anyone prior to July 26. . . . McElroy states there were no witnesses to any of the touching she alleges."*

In fact, McElroy's written statement does not discuss at all whether there were witnesses to any of the other incidents other than the July 26, 2010 altercation. Plaintiff's reliance on this point, however, obfuscates the larger truth: elements of Walker's misconduct were in fact corroborated by witnesses who provided information to Pence. In her written statement, Stacy Zachary said: "I have witnessed on several occasions him [Walker] groping on Andrea. She would move his hands and tell him to stop and he thought it was funny and kept on." Appx. N, Ex. 75 at 5. While it is true that Zachary's account does not match up exactly with any particular one of the incidents McElroy described, this is not necessarily surprising in light of the fact that both women characterized the incidents as numerous. Another witness, Tammi Holland, stated in her deposition that she had witnessed Walker touch McElroy inappropriately, and both she and Pence confirmed that, during Pence's initial investigation, she had told Pence about an incident in which Walker grabbed McElroy's breasts at work. Holland Dep. 24, 29; Pence Aff. 2. LaMarcus Jones and Tammi Holland both witnessed the July 26 altercation between Walker and McElroy, though these accounts both differ from Walker's to some degree in that they present McElroy as instigating the argument or exacerbating its vehemence. Jones Aff. ¶¶ 5–8. To the extent that Plaintiff implies Allison acted solely on the basis of McElroy's uncorroborated accusations, then, he is mistaken.

### c. *"Walker submitted his cell phone records which show that McElroy called him often during the time she claims he was harassing her."*

Walker's cell phone records appear in Plaintiff's designated evidence, but there is no indication, other than Walker's speculation, that they made their way to Pence and factored into

the company's investigation. *See* Pl.'s Ex. F-16.[8] Even if we credit Plaintiff's assertion that

Pence had access to the cell phone billing statement during the disciplinary interview, the

document does not support an inference that McElroy and Walker were engaged in a consensual

sexual relationship at the time McElroy claims he was harassing her. The bill does show calls

from McElroy's number, but it covers only the period between April 8 and May 10, 2010. *Id.* By

Walker's own recollection, his consensual relationship with McElroy did not "go south" until

around the July 4 holiday in 2010. Walker Dep. 86. Nowhere in their statements do any of the

three women accusing Walker of harassment contend specifically that his misconduct occurred

during this earlier period; moreover, the fact that Walker and McElroy exchanged phone calls in

April and May 2010 is in no way inconsistent with the allegations that Walker harassed McElroy

later that summer. Walker's cell phone bill only reinforces a point that McElroy herself conceded

in her statement—that there was a time during their stint together at Allison when Walker and

McElroy were "friends." *See* Appx. N, Ex. 14.

> **d. "Zachary reported no allegations until after she talked to McElroy after July 26, 2010. Five co-workers of McElroy and Zachary submitted a petition which stated that McElroy had a sexual affair with Walker that ended badly."**

Here, Plaintiff implicitly raises his central theory about the sexual harassment allegations

against him—that his three female co-workers, two of whom were embittered by past sexual

relationships with him that he had broken off, coordinated to fabricate their accusations in order

to oust him from his job at Allison. Taken on their own, the two assertions quoted above are not

incorrect. It is true that Zachary did not submit her statement about Walker until after July 26—

although there is no evidence that Zachary decided to complain only after, or because of, a

---

[8] In its reply brief, Defendant contends that Walker's testimony that his cell phone records "were submitted to Jeff Pence during the disciplinary interview" is inadmissible hearsay, because Walker lacked any means of personal knowledge of what happened to the records after he passed them along to union representative Kevin Cox. *See* Def.'s Reply 8. The hearsay question is not material here; as discussed above, even assuming Walker's testimony about the records is both accurate and admissible, the records prove nothing of any relevance.

conversation with McElroy. Holland did state in an affidavit that "Andrea McElroy and Stacie Zachary asked me to write a statement saying that James was touching Andrea McElroy," and that she "said no because I had not witnessed that." Pl.'s Ex. J-18, at ¶ 18. However, the context of this statement within Holland's affidavit makes clear that she was denying that sexual contact occurred during that specific July 26 verbal confrontation; in her discussion with Pence prior to the DI and in her deposition for this case, she affirmed that she had seen Walker touch McElroy inappropriately on other occasions. Holland Dep. 29; Pence Aff. 2. As for the "petition," Walker's characterization is accurate. Five co-workers signed a printed document, circulated by Walker himself, which averred that he had had sexual relationships with McElroy and Zachary and denied witnessing any "sexual misconduct or harassment by James Walker on work property or during working hours." Appx. N, Ex. 17. Pence concedes that he saw the "petition" at some point during the investigative process. Pence Dep. 45.[9]

Embedded within Plaintiff's characterization of these facts, however, is an assumption that bears discussion and refutation. His argument rests on the unstated premise that his past consensual sexual relationships with McElroy and Zachary are incompatible with accusations that he sexually harassed the two women—that the past relationships alone are sufficient to undermine the credibility of his accusers and taint the judgment of his supervisors in believing the accusations. As Defendant points out, this notion betrays an outdated view of gender relations and a misunderstanding of the nature of sexual harassment. It is fully possible that workplace sexual harassment could begin weeks, days, or even hours after a consensual relationship ends—or even occur *during* a dating relationship. *See Johnson v. West,* 218 F.3d

---

[9] Pence does not recall whether he came across the "petition" before or after the company determined to terminate Walker. Pence Dep. 45. At this stage of the proceedings, we will assume that Pence was aware of the document before consulting with Coari about termination.

725, 729–30 (7th Cir.2000). "A person's private and consensual sexual activities do not constitute a waiver of his or her legal protections against unwelcome and unsolicited sexual harassment at work." *Ammons-Lewis v. Metro. Water Reclamation Dist.*, 488 F.3d 739, 746 (7th Cir. 2007) (quoting *Winsor v. Hinckley Dodge, Inc.,* 79 F.3d 996, 1001 (10th Cir. 1996)). In the absence of evidence that the incidents *themselves* were consensual encounters misunderstood by observers, Plaintiff's reliance on his relationship history with the women is misplaced.[10]

Of course, it is possible that Walker's three accusers fabricated their accounts of his sexual harassment. In his investigation, Pence spoke to Walker's co-worker LaMarcus Jones, who confirmed that there had been an altercation between Walker and McElroy on July 26, 2010, but maintained that Walker had engaged in no workplace sexual harassment. Pence Dep. 40; Jones Aff. ¶ 9. Pence was also aware of the "petition" bearing the signature of five of Walker's co-workers and vouching for Walker's innocence of the charges. Pence Dep. 45. At the disciplinary interview, union representative Kevin Cox put forward a theory similar to the one Plaintiff relies on now; at the close of the hearing, he put his gloss on the accusations: "Looks like [a] sexual affair between 3 people that went bad. An[d] now some are trying to get revenge." Appx. N, Ex. 21 at 3. At the DI, Walker admitted having used abusive language, but denied ever touching McElroy inappropriately during work hours. *Id.* at ¶¶ 5–8. Having been apprised of this alternative theory of events, Coari and Pence agreed after the hearing that Walker had engaged in sexual harassment that included inappropriate touching, and that he should be terminated. That decision was supported by the statements of three women—including Holland, who never had a sexual relationship with Walker; the women's accounts are inconsistent with, but not refuted by,

---

[10] Particularly egregious in this respect is Plaintiff's designation of nude photographs that Zachary ostensibly sent him. *See* Pl.'s Ex. H-1. We would almost surely find such "evidence" more prejudicial than probative were this case to advance to trial, since Defendant does not deny that a relationship between the two had occurred and Walker's alleged workplace harassment of Zachary took place after the relationship had ended.

evidence that Walker put forward at the time. This Court does not sit as a "super-personnel department that reexamines an employer's facially legitimate employment decisions." *McLaurin v. Fed. Ex. Corp.*, 2 Fed. Appx. 491, 494 (7th Cir. 2001). At the very least, there was a reasonable factual basis for the company's determination that Walker had engaged in sexual harassment that included touching, and we need not probe further into their resolution of differing factual accounts. *See id.* at 494 (declining to second-guess the correctness of an employment decision as long as the plaintiff's evidence showed that it did not lack a "factual basis").

### 2. Significance of the distinction between Taylor's misconduct and Walker's

Assuming Allison reasonably concluded that Walker's sexual harassment was factually distinct from that committed by Elijah Taylor, we must now determine whether that distinction is significant enough that the two men were not "similarly situated."

At the summary judgment stage, a court should conclude that a plaintiff has met his evidentiary burden with respect to a similarly situated employee if a "prudent person, looking objectively at the incidents, would think them roughly equivalent." *Williams v. Gen. Mills, Inc.*, 926 F. Supp. 1367, 1377–1379 (N.D. Ill. 1996) (citing *Perkins v. Brigham & Women's Hosp.*, 78 F.3d 747, 751 (1st Cir. 1996)). As the Seventh Circuit has stated, "[i]t is not the province of this court to question an employer's decision to punish some conduct more harshly than other conduct. Nevertheless, we are not bound by the labels that an employer uses and must scrutinize the conduct behind those labels to determine if they are applied to similar conduct." *Gordon v. United Airlines,* 246 F.3d 878, 890–891 (7th Cir. 2001).

Here, although the company found that Plaintiff's conduct differed from Elijah Taylor's, both were disciplined for violating the company's rule against sexual harassment.[11] *See Peirick v. Ind. Univ.–Purdue Univ. Indianapolis Athletics Dep't,* 510 F.3d 681, 691 (7th Cir. 2007) (finding employees similarly situated where, though they "did not engage in the exact same misconduct . . . , they violated the very same rules"); *Davis v. Wis. Dep't of Corr.*, 445 F.3d 971, 978 (7th Cir. 2006) (finding it significant, though not dispositive, that two employees engaged in "identical rule violations"). The Seventh Circuit has recently taken pains to make clear that the "similarly situated" element of the *McDonnell Douglas* test is part of a burden-shifting framework designed to ease, rather than complicate, the task of a plaintiff in laying out a *prima facie* case. "The Supreme Court 'never intended' the requirements 'to be rigid, mechanized, or ritualistic ... [but] merely a sensible, orderly way to evaluate the evidence in light of common experience as it bears on the critical question of discrimination.'" *Coleman*, 667 F.3d at 846 (quoting *Furnco Constr. Corp. v. Waters,* 438 U.S. 567, 577 (1978)). At this stage, we ask, "essentially, are there enough common features between the individuals to allow a meaningful comparison?" *Humphries,* 474 F.3d at 405. The allegations against Walker and Taylor both describe highly objectionable conduct in violation of Allison's policy against workplace sexual harassment; not every reasonable fact-finder would conclude that the accusations against Walker are of a different order of magnitude than the lewd sexual remarks Taylor made and the explicit

---

[11] Walker's notice of discharge cited his violation of Allison's sexual harassment *and* "workplace violence" policies. Appx. N, Ex. 84; *see also* Pl.'s Ex. N-36 at ¶ 2. ("Defendant's Answer to Plaintiff's First Set of Interrogatories") ("Plaintiff was terminated based on Defendant's belief that he violated Defendant's Sexual Harassment and Workplace Violence policies"). By contrast, Defendant has stated that Taylor was disciplined for violation of the sexual harassment policy alone. *See* Pl.'s Ex. N-36 at ¶ 8(a)(ii). However, the record is sparse with respect to the "workplace violence" prohibition, and Defendant has not relied on Walker's separate violation of this policy in support of its argument that Walker and Taylor were not similarly situated. *See* Def.'s Br. 23–24. For this reason, we follow the parties' lead in confining our inquiry to the sexual harassment policy and the two men's alleged violations of it.

photograph he displayed. Under these circumstances, we conclude that Walker and Taylor are sufficiently "similarly situated" to satisfy Plaintiff's preliminary burden.

## III.    Pretext

Plaintiff having set forth a *prima facie* case, Defendant bears the burden of articulating a legitimate, non-discriminatory reason for its decision to terminate Walker. Here, Allison has consistently maintained that it terminated Walker because he violated the company's sexual harassment and workplace violence policies. Def.'s Br. 27; Pl.'s Ex. N-36 at ¶ 2; Appx. N, Ex. 79. Sexual harassment of co-workers is, of course, a legitimate basis for terminating an employee. *See, e.g., Cung Hnin v. TOA (USA), LLC,* 2014 WL 1758457, *5–6 (7th Cir. 2014). If Plaintiff is to avoid summary judgment on his Section 1981 claim, he must then demonstrate that Allison's proffered basis for his dismissal is a pretext for discriminatory motives. *Id.*

Our inquiry into pretext lacks the formulaic structure that characterizes the four-part *prima facie* test. Precedent commands that an employer's ostensible reason for taking an adverse employment action is not pretextual unless it "is a lie or completely lacks a factual basis." *Jordan v. Summers,* 205 F.3d 337, 343 (7th Cir. 2000); *Johnson v. City of Fort Wayne,* 91 F.3d 922, 931 (7th Cir. 1996). At heart, it is a question of good faith: "An inquiry into pretext requires that we evaluate the honesty of the employer's explanation, rather than its validity or reasonableness." *Hill v. Tangherlini,* 724 F.3d 965, 968 (7th Cir. 2013). "It is not our province to decide whether that reason was wise, fair, or even correct, ultimately, so long as it truly was the reason for the plaintiff's termination." *Silverman v. Bd. of Educ. of the City of Chi.*, 637 F.3d 729, 738 (7th Cir. 2011) (citations omitted). A plaintiff can prove the dishonesty of an employer's proffered justification by direct evidence of bad faith or discriminatory intent; more commonly,

he can do so by pointing to objective evidence that strongly supports an inference of subjective dishonesty. *Gordon*, 246 F.3d at 889. "A determination of whether a belief is honest is often conflated with analysis of reasonableness . . . . [T]he more objectively reasonable a belief is, the more likely it will seem that the belief was honestly held." *Id.*

Here, Plaintiff presents no direct evidence that the decision-makers responsible for Allison's decision to terminate him did not sincerely and reasonably believe that he had engaged in sexual harassment. Walker himself conceded in his deposition that he had no reason to suspect that Pence or "anyone in labor relations" did not believe the complaints made to them by McElroy, Zachary, or Holland. Walker Dep. 159. Only one statement that appears in the parties' designated evidence is even arguably racist: co-worker Monica Nelson's claim that McElroy referred to Walker as a "nigger" in discussing her desire to get him fired. Nelson Dep. 30. However, the fact that Walker's African American co-worker, who is not a member of management and had no authority over him, used a racist epithet has no conceivable connection to discriminatory motives on the part of the company's decision-makers. There is no direct evidence that Walker's race played any role in the statements or actions of McDaniel, Pence, Coari, or anyone else in a supervisory role with the company.

Nor does Plaintiff muster compelling indirect evidence of pretext. As we have already noted, the company had an ample factual basis for concluding that sexual harassment had occurred, *see supra,* § II(B)(1); it is not for us to second-guess their reasonable decision to believe the three women who presented complaints rather than the alternate theory put forth by LaMarcus Jones, the "petition" signers, and union representative Kevin Cox. *See McLaurin*, 2 Fed. Appx. at 494. Moreover, the company has been consistent in articulating Walker's sexual harassment as the moving force behind the investigation and firing. *Cf. Gordon,* 246 F.3d at

890–891 (finding company representatives' "inconsistency" in presenting the reasons for their actions as relevant to a pretext inquiry). Walker's DI was concerned almost exclusively with sexual harassment, his notice of dismissal cited the same behavior as the reason for his discharge, and company decision-makers Pence and Coari have since affirmed that the sexual harassment prompted the termination. Pl.'s Ex. N-36 at ¶ 2; Appx. N, Ex. 79 (notice of dismissal); Coari Dep. 10–11; Pence Aff. at ¶ 9.

## A. Accounts of Walker's behavior at the DI

Plaintiff can point to only one arguable gap in the consistency of Allison's accounts. In explaining why he found the three accusations against Walker credible after the DI, Pence stated that "my conclusion . . . was supported by the fact that Walker admitted calling his female co-workers 'bitches' and 'oompa loompa,' which gave credibility to the other allegations made against Walker." Pence Aff. at ¶ 10. He went on to note that "the decision was further bolstered by the fact that during the DI itself, Walker appeared generally unconcerned about the gravity of the charges against him. To me, Walker's crass reference to his sexual relationships by his use of the phrase 'I fucked those bitches' also supported the conclusion that he engaged in the sexual harassment of which he was being accused." *Id.* Walker denies that he ever uttered that phrase during his disciplinary hearing, and he also resists Pence's characterization of him as nonchalant or "unconcerned" during the DI. Walker Aff. at ¶ 20.

But Pence never cited Walker's attitude at the hearing as a reason for his termination; instead, he noted that it was one of two additional factors enhancing the credibility of the accusations. *See* Pence Aff. at ¶¶ 9–10.[12] Rather, the primary factors supporting the final

---

[12] Before discussing Walker's attitude at the hearing, Pence's affidavit states as follows: "Based on the allegations contained in the complaints I had received from Zachary, McElroy, and Holland, which I found to be credible, as

27

decision, according to both Pence and Coari, were the three separate written statements by female co-workers, which were lent credibility by their consistency with one another, the presence of Holland as a "third-party" witness to Walker's behavior toward McElroy and Zachary, and their partial corroboration by Walker's own admissions. *See* Pence Aff. ¶ 9; Coari Dep. 21–22 (discussing the credibility of the accusations, especially the importance of Holland as "the third woman who filled out a witness statement [who] was not alleged to have had sexual relations with Mr. Walker"). Even assuming that Walker's recollection of the DI is the correct one and he behaved with perfect propriety at the hearing, he has not succeeded in calling the honesty of Allison's proffered explanation—that he was fired because co-workers made credible sexual harassment allegations against him—into question. *Cf. Silverman,* 637 F.3d at 739 (explaining that "mere disagreement" with the employer's reasoning is insufficient to raise an inference of pretext).

## B. Allison's treatment of Elijah Taylor

Plaintiff also points to Allison's more lenient treatment of white co-worker Elijah Taylor, who received a 30-day suspension for violating the company's sexual harassment policy, as evidence of pretext.

A showing that a similarly situated employee belonging to a different racial group received more favorable treatment can "serve as evidence that the employer's proffered legitimate, nondiscriminatory reason for the adverse job action was a pretext for racial discrimination." *Gordon,* 246 F.3d at 892 (quoting *Graham v. Long Island R.R.*, 230 F.3d 34, 43 (2d Cir. 2000)); *see also Hiatt v. Rockwell Int'l Corp.*, 26 F.3d 761, 770 (7th Cir. 1994).

---

well as their confirmation of those allegations in my conversations with each of them, and my interview of Walker, I concluded that Walker should be terminated for violations of Allison's Sexual Harassment and Workplace Violence policies." Pence Aff. ¶ 9.

However, the existence of a similarly situated employee treated more favorably does not always warrant an inference of pretext; rather, such evidence must be persuasive enough, in combination with other evidence or by itself, to enable a reasonable fact-finder to conclude that the employer's justification for its action is a fabrication. *See generally Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147–148 (2000) (discussing the nature of a plaintiff's evidentiary burden in establishing pretext and the role of "similarly situated" evidence). Here, we agree with Defendant that its stated justification for its actions undermines any persuasive force arising out of the comparison between Plaintiff and Elijah Taylor.

Allison has reasonably and consistently articulated a factual distinction between the two men's cases: Walker's misconduct involved physical conduct and multiple victims, while Taylor engaged in purely verbal harassment of only one woman.[13] Def.'s Br. 22–25. Mary Coari described the distinction between contact and lack of contact in sexual harassment as the company's "general guideline" in deciding whether to terminate an employee or impose lesser discipline; Allison will terminate an employee whose conduct is "egregious" and who crosses that line. Coari Dep. 11.[14] Labor relations representative Maurice McDaniel affirmed that, while the company has a "zero tolerance" policy with regard to sexual harassment, it recognizes gradations of severity that are consistent with the variation between the punishments meted out to Taylor and Walker. McDaniel Dep. 18–20. As we have already noted, it is possible to imagine that an employer could adopt a protocol with different priorities, under which Taylor would

---

[13] We have already discussed the company's factual basis for arriving at this distinction. *See supra,* § II(B)(1).
[14] Her exact testimony on the point was as follows:
> Q: Why was [Elijah Taylor] suspended as opposed to terminated?
> A: Because there was no physical contact.
> Q: So the only time you would terminate an employee for sexual harassment would have to involve physical contact?
> A: It would depend on how egregious the act was, but that's the general guideline.

Coari Dep. 11.

merit punishment equal to, or greater than, that received by Walker. Nonetheless, the company's explanation is a reasonable one. *See, e.g., Anderson v. Boston Sch. Comm.,* 105 F.3d 762, 766 (1st Cir. 1997) ("A simultaneous complaint by three female students involving touching, suggestive remarks, and observation of other such conduct, together with unwanted telephone calls at home, would seem to involve a demonstrably different order of magnitude than the solitary charges against the . . . white employees."); *Egued v. Postmaster Gen. of U.S. Postal Serv.,* 155 Fed. Appx. 439, 441 (11th Cir. 2005) (distinguishing sexual harassment cases based on the presence of "touching" and the number of victims). Plaintiff has made no argument and cited no evidence in support of the notion that Allison's reliance on these distinctions was disingenuous; he contends only that he did not engage in the touching of which he was accused.[15] Moreover, based on the data in the record, Allison applied the principle consistently: Berry (white) and Walker (African American) were both terminated for sexual harassment that included physical contact, while Taylor, who was not accused of making contact with his victim, received only a suspension.[16]

"The issue of pretext does not address the correctness or desirability of reasons offered for employment decisions. Rather it address the issue of whether the employer honestly believes in the reasons it offers." *McCoy v. WGN Cont'l Broad. Co.,* 957 F.2d 368, 373 (7th Cir. 1992); *see also Washington v. Indianapolis Pub. Sch.*, 2012 WL 1137099, at *6 (S.D. Ind. Apr. 4, 2012). We have been given no reason to disbelieve Allison's assertion that the relative severity

---

[15] Plaintiff contends that "McElroy's allegations are not true and no reasonable person could honestly believe they were true. Once those allegations are stripped away, Taylor's conduct is arguably more serious than Walker's." Pl.'s Resp. 33. We have already addressed and rejected the claim that Allison was unreasonable in accepting the allegations against Walker.

[16] Rock Swartz, who appears in the designated evidence but was never discussed by Plaintiff, was a white employee who was not terminated after being investigated for conduct that did *not* include sexual touching. Pence Dep. 9–11. This, too, is consistent with Allison's stated approach.

of his misconduct, rather than his African American race, underlay the heavier discipline imposed on Walker.

## IV. Conclusion

The Supreme Court devised the *McDonnell Douglas* framework to aid plaintiffs in employment discrimination by giving them an opportunity, after an initial *prima facie* showing, to force employers to articulate, and defend, non-discriminatory bases for their actions. *See Tex. Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 252–255 (1981). Here, Plaintiff was unable to take advantage of the framework's generosity. He has adduced no evidence that Allison's explanation for his termination was a pretext, nor has he pointed us to any evidence that would be sufficient to draw an inference of systematic discrimination based upon one instance in which a white employee—Elijah Taylor—received a lesser penalty. At its core, his argument amounts to a plea that he was wrongly accused by his three female co-workers. We have neither the capacity nor the authority to determine for sure whether Plaintiff sexually harassed his fellow employees; we do conclude, however, that no reasonable fact-finder could ascribe the discipline he received to racial discrimination. We therefore GRANT Defendant's motion for summary judgment on Plaintiff's Section 1981 claim.

IT IS SO ORDERED.

Date: _____6/10/2014_____          _Sarah Evans Barker_____
                                        SARAH EVANS BARKER, JUDGE
                                        United States District Court
                                        Southern District of Indiana

Distribution:

Emmanuel V.R. Boulukos
ICE MILLER LLP
emmanuel.boulukos@icemiller.com

Michael L. Tooley
ICE MILLER LLP
Michael.Tooley@icemiller.com

Tami A. Earnhart
ICE MILLER LLP
earnhart@icemiller.com

Gregory A. Stowers
STOWERS & WEDDLE PC
gstowers@swh-law.com